NEW YORK



June 22, 2016          **DOC #___1___**

Hon. P. Kevin Castel
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

**16 MISC 239**

Dear Judge Castel:     **MEMO ENDORSED**

I am writing to you in your capacity as the Part 1 judge to request the unsealing of federal court records regarding Jona Rechnitz, a Brooklyn businessman implicated in a widespread corruption probe into the New York City Police Department and the New York City Office of the Mayor.

Because the case is sealed, it is unclear which federal judge is assigned to the case. Clerks for judges Forrest and Stein, who preside over the related open cases, said they are not assigned to the case. I ask that you relay my request to the appropriate authority.

I am an editor for the online publication DNAinfo New York, which covers politics, crime and neighborhood news throughout the five boroughs of New York. Our readership is deeply invested in the health of the city and the integrity of its public employees.

Mr. Rechnitz is known to be cooperating with federal investigators and has pleaded guilty to undisclosed federal charges. He is currently awaiting sentencing before the court.

The sealing of his criminal case no longer serves the purpose of justice. Mr. Rechnitz's involvement in the federal investigation into corruption in the NYPD and the Correction Officers Benevolent Association has been widely reported. His cooperation with federal prosecutors in the Southern District of New York was revealed Wednesday in a New York Times article and other publications, including DNAinfo.com. Any strategic advantage held by the U.S. Attorney's office in sealing the file has therefore been lost due to the disclosure of Mr. Rechnitz's role in the case.

Mayor Bill de Blasio and Police Commissioner William Bratton have both spoken publicly about the corruption investigation and have mentioned Mr. Rechnitz's involvement in the probe. Several high ranking police officers have been demoted, suspended or fired over their role in the alleged corruption. Federal prosecutors have subpoenaed records regarding Mr. Rechnitz's relationship with the NYPD.

810 7th Ave. Suite 800 | New York, NY 10019
Main (646) 435-9100 | Fax (646) 368-6820
DNAinfo.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _6-24-16_

DNAinfo understands the balance the court must strike between maintaining the long history of openness and the protection of cooperating witnesses in public corruption cases, however we feel the scales have been tipped toward opening the file in light of recent reports previously mentioned.

Further, there is a strong public interest in unsealing the records and allowing the public fully to be informed not only about allegations that call into question the integrity of its local government, but also the way the judicial system addresses such cases.

The U.S. Supreme Court consistently has recognized that the public and press have a presumptive First Amendment right of access to judicial proceedings in criminal cases. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality opinion) ("a presumption of openness inheres in the very nature of a criminal trial under our system of justice"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 602-03 (1982) (recognizing First Amendment access right and striking down statute that required "the exclusion of the press and general public during the testimony of a minor victim in a sex-offense trial"); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 505 (1984) (constitutional presumption of openness to voir dire proceedings); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 13 (1986) (recognizing right of access to preliminary hearings); *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 149 (1993) (same); *Waller v. Georgia*, 467 U.S. 39, 47 (1984) ("any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors").

The U.S. Supreme Court has recognized a common-law right "to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted). The Third Circuit agreed, finding that in both civil and criminal cases "the existence of a common law right of access to ... inspect judicial records is beyond dispute." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1066 (3rd Cir. 1984). Many lower courts have recognized a *constitutional* right to court records as well. For example, the Second Circuit noted that it was following other circuits in "constru[ing] the constitutional right of access to apply to written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *In re New York Times Co.*, 828 F.2d 110, 114 (2nd Cir. 1987) (citations omitted); *see also In re Providence Journal Co.*, 293 F.3d 1, 10 (1st Cir. 2002) ("this constitutional [access] right ... extends to documents and kindred materials submitted in connection with the prosecution and defense of criminal proceedings") (quoting *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 502 (1st Cir.1989)); *Associated Press v. District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983) ("the public and press have a first amendment right of access to pretrial documents in general").

Federal appellate courts have also recognized that the constitutional presumption of access applies to court dockets. The Second Circuit ruled that "the press and public possess a qualified First Amendment right of access to docket sheets" in part because "the ability of the public and press to attend civil and criminal cases would be merely theoretical if the information provided by docket sheets were inaccessible." *The Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 86, 93

(2004). Likewise, in *U.S. v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993), the court found that the district court's "maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."

In keeping with this long tradition, I ask that you as the Part 1 Judge direct my request to the appropriate authority to decide on unsealing the file broadly if possible or sealing narrowly if necessary.

Thank you for your time.

Sincerely,

Janon Fisher
Editor
DNAinfo New York
(646) 591-8732

cc: Assistant U.S. Attorney Russell Capone, Defense Attorney Alan Levine

(2004). Likewise, in *U.S. v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993), the court found that the district court's "maintenance of a dual-docketing system is an unconstitutional infringement on the public and press's qualified right of access to criminal proceedings."

In keeping with this long tradition, I ask that you as the Part 1 Judge direct my request to the appropriate authority to decide on unsealing the file broadly if possible or sealing narrowly if necessary.

Thank you for your time.

Sincerely,

Janon Fisher
Editor
DNAinfo New York
(646) 591-8732

cc: Assistant U.S. Attorney Russell Capone, Defense Attorney Alan Levine

---

This is an application by the editor of an online publication to unseal and/or gain access to information regarding possibly pending criminal proceedings that the applicant asserts may be under seal. It is presented to the undersigned as the judge presiding in Part 1. The application should be filed and assigned a Miscellaneous docket number and the applicant shall cause it to be served upon the United States Attorney Office ("USAO") for this District. The USAO shall serve and file its response seven (7) days after service. The response need not, in the first instance, confirm the existence of any matter that is under seal but should address the lawfulness of its practices in obtaining sealing and delayed docketing orders and the scope of any right of public access thereto. Applicant may reply five (5) days thereafter. It will be heard by the Judge then presiding in Part 1.

SO ORDERED.

U.S.D.J.
Part 1
New York, NY
June 24, 2016

**The New York Times**   http://nyti.ms/20BSppg

N.Y. / REGION

# De Blasio Plays Down Contact With Men at Heart of U.S. Inquiry

By WILLIAM NEUMAN   APRIL 13, 2016

Mayor Bill de Blasio said on Wednesday that he had conversations "over the course of 2014" and into the next year with two financial backers who are now at the center of a federal investigation, acknowledging more extensive contact with the men than he had previously.

But he refused to say what the conversations were about or how frequently they occurred.

Mr. de Blasio said that in response to news accounts of the investigation into fund-raising by the men, Jona S. Rechnitz and Jeremy Reichberg, he had instructed a lawyer for his political campaign to contact the office of Preet Bharara, the United States attorney for the Southern District of New York, which includes Manhattan.

"He reached out at my request and simply said, 'We'd like to be helpful in any way we can, happy to provide any information that would be helpful,'" Mr. de Blasio, a Democrat, said of the lawyer, Barry Berke. He added that he had no knowledge of any investigation beyond what he had learned from news reports, and that neither he nor anyone in his administration had been contacted by federal investigators regarding an inquiry into his campaign fund-raising that focuses on the two men.

Mr. de Blasio spoke shortly after the Police Department announced it had reassigned another top official as a result of the investigation into the two men. The official, Deputy Chief Andrew Capul, the executive officer of the Manhattan North

patrol borough, was transferred to an administrative position, becoming the fifth senior official to be reassigned because of the inquiry.

The authorities began looking at the activities of Mr. Rechnitz, a Manhattan real estate developer, and Mr. Reichberg, a Brooklyn businessman, during an investigation into an alleged Ponzi scheme in which the men were investors, according to people briefed on the matter.

The investigators then discovered a web of contacts between the two men and high-level Police Department officials. In questioning about 20 such officials, the investigators asked about links to the men and allegations of free trips and meals the men may have provided.

At the same time, the people briefed on the case said, the federal investigators were focusing on substantial donations that Mr. Rechnitz gave to Mr. de Blasio and groups allied with the mayor in 2013 and 2014, and other money he raised. They were also looking at Mr. Reichberg's role in hosting a fund-raiser at his Brooklyn home in May 2014, which was attended by the mayor. Both men were named to the mayor's inauguration committee in late 2013, along with a roster of more than 70 other supporters, including actors and writers.

The two men and the police officials have not been charged with a crime.

Mr. de Blasio said on Sunday that he had not met the two men until after he won the Democratic primary for mayor in September 2013 and was not particularly close to them, adding that he really had not "seen them in the last year or more."

The next day, the mayor said he knew of "no favorable municipal action that they got." He also said that would be the last time he answered questions about the men.

But on Wednesday, Mr. de Blasio announced that his lawyer had reached out to prosecutors and was then pressed again to provide more details about his relationship with the men.

"It's very simple," he said. "To the best of my memory, I did not know them before the fall of 2013."

During the general election campaign, he said, "they did a lot to support the effort," adding that it was "a very normal thing" to include them in the inauguration committee, which was a largely honorific body.

Referring to the May 2014 fund-raiser for the Campaign for One New York, a group organized to support the mayor's agenda, he said, "They held one event at one of their homes, which I don't remember really that well because it was just another event at someone's home." The event raised at least $35,000.

He continued, "And then I had some conversations with them over the course of 2014 but really haven't had many conversations since the beginning of 2015."

Asked for more information on the conversations, he said, "I've told you all I'm going to tell you for now."

Detailed records of the mayor's schedule kept by his office show no meetings or other contact with either of the men except for the May 2014 fund-raiser held at Mr. Reichberg's home in Borough Park, Brooklyn. A video posted online shows Mr. de Blasio arriving outside Mr. Reichberg's three-story brick home, with a mansard roof, and being greeted by a large crowd. A man can be heard telling the mayor that the crowd had waited for him for two and a half hours, and Mr. de Blasio responds incredulously before giving a bearhug to a man on the sidewalk.

In at least one respect, Mr. Rechnitz appeared to distinguish himself as a donor in a way that was likely to have caught the mayor's attention. In the fall of 2014, when Mr. de Blasio was making a major and ultimately unsuccessful push to help Democrats take control of the State Senate, a company controlled by Mr. Rechnitz donated $102,300 to the New York State Democratic Senate Campaign Committee. State records show that it was the single-largest donation to the committee; the only comparable donations were made by union-affiliated political action committees.

"Someone who makes a donation, that's their choice; they should expect nothing in return," Mr. de Blasio said. "You'd like to believe people are making donations because they think someone would be a good leader."

Referring to allegations against the few top officials, he said: "I'm not going to

prejudge them. They deserve due process, but anyone who accepts personal gifts in the year 2016 is not paying attention to today's ethics standards or the ethics training that I'm sure they were given along the way."

Prosecutors from Mr. Bharara's office have also joined an unrelated examination by the state attorney general of a series of transactions that have also raised questions about the conduct of officials in the de Blasio administration, a person with knowledge of the matter said. The transactions included the lifting of a deed restriction on a Manhattan nursing home that enabled its purchase by a luxury condominium developer for $116 million.

The person with knowledge of the matter said the federal prosecutors were monitoring the inquiry, but that it remained unclear whether the deals rose to the level of criminal conduct.

On Tuesday night, Mr. Bharara, who recently won convictions of prominent state legislators, said he would "keep looking hard at corruption in our legislative branch as we have been."

"But not just there," he added. "In the executive branch too, both in city and in state government. Executive offices in government are far from immune from a creeping 'show me the money' culture that has been pervading New York for some time now."

J. David Goodman, William K. Rashbaum and Rick Rojas contributed reporting.

A version of this article appears in print on April 14, 2016, on page A19 of the New York edition with the headline: De Blasio Plays Down Contact With Two Men at Heart of Corruption Case.

© 2016 The New York Times Company

N.Y. / REGION

# De Blasio Donor Emerges as Key Witness in Corruption Case. What Else Does He Know?

By WILLIAM K. RASHBAUM   JUNE 8, 2016



Jona S. Rechnitz has pleaded guilty to fraud conspiracy charges. Baruch Ezagui

Of all the charges and the allegations in a 17-page criminal complaint accusing a powerful New York City union leader of corruption, perhaps the most far-reaching development was woven into the legal boilerplate, essentially hiding in plain sight.

A person, referred to as "CW-1," for Cooperating Witness 1, had agreed to cooperate with federal prosecutors and the Federal Bureau of Investigation.

The cooperator's name was not mentioned in the complaint unsealed on Wednesday, but several people with knowledge of the matter said it was Jona S. Rechnitz, a central figure in one of the half-dozen continuing federal corruption investigations focused on Mayor Bill de Blasio's fund-raising.

Mr. Rechnitz, who has generously supported several of Mr. de Blasio's interests and served on the mayor's inaugural committee, has pleaded guilty to fraud conspiracy charges in connection with the corruption case against Norman Seabrook, the influential leader of the union that represents the city's correction officers, and another defendant, according to the complaint.

But the significance of his decision to join the roster of government

witnesses could go far beyond the case against the union leader, and have wide-ranging consequences for Mr. de Blasio.

The complaint in the corruption case, along with statements by Preet Bharara, the United States attorney for the Southern District of New York (whose office brought it), and interviews with people with knowledge of the fund-raising inquiries, strongly suggest that Mr. Rechnitz could serve as an important witness in at least one of the fund-raising matters.

At a news conference on Wednesday announcing the charges against Mr. Seabrook, Mr. Bharara declined to answer questions about the identity of CW-1 and the degree to which the witness could be helpful in other cases.

But he noted that "the complaint does say that he is assisting other investigations as well; that's all I'll say."

Almost all of the fund-raising investigations are being conducted by the same group of F.B.I. agents and federal prosecutors — two squads of agents known as C4 and C14 and the prosecutors in Mr. Bharara's public corruption unit — that handled the case against Mr. Seabrook, who was arrested along with Murray Huberfeld, a hedge fund financier.

While Mr. Bharara also declined to answer questions about the fund-raising inquiries during the news conference, he left little doubt that there were more public corruption cases on the horizon.

"As those of you who come here often appreciate, it is seldom the case that the bringing of a particular charge at a particular date is the end of the matter," he said. "We're still investigating lots of different things, and you should expect to see me again."

The accusations in the complaint do not involve Mr. de Blasio, nor are they related to any of the possible improprieties that are under scrutiny in the more than half a dozen inquiries swirling around the mayor and his aides. Mr. de Blasio, a Democrat, has steadfastly defended his fund-raising efforts.

However, the complaint notes that Mr. Rechnitz has pleaded guilty in

connection with the corruption case, "among other things," and is "providing information to the government in the hopes of obtaining leniency when he is sentenced."

It also says that Mr. Rechnitz has undergone "extensive debriefings," and that the information he has provided has been "reliable and corroborated by independent evidence."

A lawyer for Mr. Rechnitz, Alan Levine, declined to comment.

Investigators and others briefed on the matter have said the fund-raising inquiry that had once been focused on Mr. Rechnitz now centers on whether city officials provided him with some benefit for his real estate business in exchange for campaign contributions.

The development represented a stark turn of fate for Mr. Rechnitz, 33, who came to New York from Los Angeles to build things: condominiums, hotels and the like. But as he gained a footing in the city, he found that it was easier to build relationships, often founded on money.

He and another businessman, Jeremiah Reichberg, who also raised money for the mayor and served on the committee that planned his 2014 inaugural celebration, spent a good deal of time cultivating roughly a score of senior police officials, lavishing some with gifts and trips.

Mr. Reichberg, according to people briefed on the matter, is the man identified in the criminal complaint as Co-Conspirator 1 or CC-1, and also was involved in the alleged scheme, although he was not charged.

The complaint details a series of trips to the Dominican Republic, Israel and elsewhere that Mr. Seabrook took with Mr. Rechnitz, Mr. Reichberg and a top police official. All were paid for by Mr. Rechnitz.

The investigation has so far uncovered misconduct by nearly a dozen mostly senior police officials, including five chiefs who have filed for retirement as a result, and a number of other senior officials, who have been transferred to administrative posts pending possible discipline. One detective has been

fired.

Few of them are likely to be happy about their interactions with Mr. Rechnitz. Indeed, they may share the feelings Mr. de Blasio expressed on Wednesday, which seemed to tumble out when a reporter asked about his connection to the businessman.

"I wish I never met the guy," the mayor said.

### Correction: June 11, 2016
*An article on Thursday about Jona S. Rechnitz, a cooperating witness in a corruption case against the correction officers union leader and a central figure in one of the corruption investigations focused on Mayor Bill de Blasio's fund-raising, misstated Mr. Rechnitz's age. He is 33, not 26. The article also omitted a group of F.B.I. agents who are investigating some of the fund-raising issues. Besides the F.B.I. squad known as C14, a squad called C4 is also part of the inquiry.*

A version of this article appears in print on June 9, 2016, on page A16 of the New York edition with the headline: Cooperating Witness in Corruption Case May Assist in de Blasio Inquiries.
Order Reprints | Today's Paper | Subscribe

DOWNTOWN (//WWW.DNAINFO.COM/NEW-YORK/MANHATTAN/DOWNTOWN)

Crime & Mayhem (//www.dnainfo.com/new-york/topics/crime-mayhem)   Politics (//www.dnainfo.com/new-york/topics/politics)

# Correction Union Head Arrested on Fraud Charges in Federal Corruption Probe

By  Murray Weiss (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/murray-weiss), Aidan Gardiner (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/aidan-gardiner) and Jeff Mays (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/jeff-mays) | June 8, 2016 8:22am





▲ View Full Caption                                                                                                      DNAinfo/Ben Fractenberg

NEW YORK CITY — The head of the city's correction officers' union was arrested Wednesday morning in an ongoing federal probe into the NYPD and City Hall for his part in a yearslong fraud scheme involving wire-tapped phone calls and bribes delivered in expensive Ferragamo (http://www.ferragamo.com/shop/en/usa) bags, federal law enforcement authorities said.

Norman Seabrook, president of the Correction Officers' Benevolent Association (https://www.dnainfo.com/new-york/20160608/civic-center/corrections-union-head-arrested-federal-corruption-probe-sources-say), personally got tens of thousands of dollars in kickbacks for steering about $20 million in union money to the Platinum Partners hedge fund

of thousands of dollars in kickbacks for steering about $20 million in union money to the Platinum Partners hedge fund in a scheme dating back to December 2013, according to the U.S. Attorney's office.

Seabrook met Manhattan-based hedge fund manager Murray Huberfeld through a mutual friend, Jona Rechnitz, designated as "CW-1" in court papers, according to officials and sources.

▶ *Scroll down to read the court papers outlining Seabrook's alleged scheme*

Seabrook and Huberfeld, both of whom were arrested about 6 a.m. Wednesday in their respective homes, were charged with conspiracy to commit honest services wire fraud and honest services fraud, sources said.



**Ben Fractenberg**
@fractenberg

Follow

.@PreetBharara diagrams the Norman Seabrook corruption investigation @DNAinfo
12:53 PM - 8 Jun 2016
   17    11

Rechnitz, a real estate mogul being investigated for the $35,000 he raised for Mayor Bill de Blasio's Campaign for One New York, pleaded guilty to fraud in hopes he might get some leniency when he's sentenced, federal prosecutors said.

Wearing flip-flops, jeans and an untucked dress shirt, Seabrook told reporters, "I feel like a million dollars" after his arraignment Wednesday afternoon. He was released on $250,000 bail.

▶ Here's What We Know About the Probe Into Mayor Bill de Blasio's Fundraising (https://www.dnainfo.com/new-york/20160428/civic-center/heres-what-we-know-about-probe-into-mayor-bill-de-blasios-fundraising)
▶ Who's Who in the Federal NYPD/City Hall Corruption Probe (https://www.dnainfo.com/new-york/20160411/civic-center/whos-who-fbis-nypdcity-hall-corruption-probe)
▶ De Blasio Campaign to Return $32,200 After DNAinfo Finds Shady Donations (https://www.dnainfo.com/new-york/20160530/glendale/de-blasio-campaign-return-56700-after-dnainfo-finds-shady-donations)

Seabrook, who has worked as a correction officer since 1985, traveled to the Dominican Republic with Rechnitz in late 2013 and confided in him during a night of drinking that he wanted to get bribed to invest his union's money, prosecutors said.

"[It's time that] Norman Seabrook got paid," Seabrook said, according to the complaint against him.

Rechnitz acted as an intermediary between Seabrook and Huberfeld, relaying terms of the deal and eventually carrying kickbacks to the union boss, prosecutors said.

"How much is Norman Seabrook going to get paid?" Seabrook asked Rechnitz, who told him that he could net up to $150,000 depending on the hedge fund's profit.

In one kickback payment on Dec. 11, 2014, Rechnitz went to Seabrook's favorite luxury goods store in Manhattan, Salvatore Ferragamo and bought an $820 bag, prosecutors said. He filled it with $60,000 and brought it to Seabrook who was only a couple blocks away, feds said.

Seabrook became enraged when Rechnitz told him how much was inside because he didn't think it was enough, according to an affidavit from FBI Special Agent Blaire Toleman contained in Seabrook's federal complaint.

The trio hoped to hide the bribes by drafting fake invoices showing that Huberfeld's hedge fund paid Rechnitz for his season tickets to the Knicks, Toleman said.

"At the time of this supposed payment of $7,500 per game, the New York Knicks' record was 4-20," the complaint against Seabrook reads.

Huberfeld's fund never got the Knicks tickets, prosecutors also noted.

Between January and May 2015, FBI investigators recorded phone calls between Huberfeld and Rechnitz's embattled partner Jeremy Reichberg, who also raised $35,000 for the mayor's nonprofit and allegedly wooed NYPD officers with lavish trips.

Reichberg was identified in Seabrook's federal complaint as co-conspirator-1 or CC-1 who boasted, "I have the right connections and I might as well use mine."

Huberfeld would sometimes refer to money as "gelt" and "pressured" Reichberg to convince Seabrook to invest more union dollars in his hedge fund, prosecutors said.

"What are we doing about getting Murray more money," Huberfeld asked Reichberg, referring to himself in the third person.

Huberfeld wanted more COBA investments because other clients kept withdrawing as much as $44 million from the hedge fund, prosecutors said.

But Seabrook couldn't invest more money because he was having some of his own internal problems, prosecutors said. A former union board member, whom Seabook had fired, was suing him for violating union rules and improperly investing in Huberfeld's Platinum fund.

"There's no money now [because of an] internal problem with a guy," Rechnitz told Reichberg.

After the union boss's arraignment Wednesday afternoon, his lawyer, Paul Shechtman, disparaged the prosecutor's case and vowed take the charges to trial.

"Norman Seabrook has spent his entire life fighting," Shechtman, a former federal prosecutor, said. "He's not going to walk away from a fight. This is a one witness case. This witness has a lot of baggage."

The lawyer also took the opportunity to bash the Knicks.

"The only corroboration seems to be no one would pay $60,000 for Knicks tickets," Shechtman said.

Seabrook, who still works for the city's Department of Correction, will be suspended from that post, Mayor Bill de Blasio said at press conference Wednesday morning.

"These are allegations, but I'll say this: if proven true, it's disgusting and it's very, very sad. It means he stole money from his own workers. That's what it comes down to," the mayor said.

De Blasio said he's had a "very fraught" relationship with Seabrook, particularly over reforms the mayor wanted to make to Rikers Island.

"I just want to offer my thoughts to the people who work at Rikers and work in our Department of Correction," the mayor said.

"We are going to continue to effectively change the work we do, improve it, reform it. We're going to get past this moment and move forward," he added.

*Refresh this page for further updates.*

U.S. v. Seabrook and Huberfeld Complaint (https://www.scribd.com/doc/315160708/U-S-v-Seabrook-and-Huberfeld-Complaint)

---

**16 MAG 3626**

```
Approved:  Russell Capone
           MARTIN S. BELL / RUSSELL CAPONE / KAN M. NAWADAY
           Assistant United States Attorneys

Before:    HONORABLE ANDREW J. PECK
           United States Magistrate Judge
           Southern District of New York

- - - - - - - - - - - - - - - - -x
                                         SEALED
UNITED STATES OF AMERICA                 COMPLAINT
                                :
         - v. -                          Violations of
                                :        18 U.S.C. §§ 1343, 1346,
NORMAN SEABROOK and                      1349, 2
MURRAY HUBERFELD,               :
                                         County of Offense:
         Defendants.            :        New York

- - - - - - - - - - - - - - - - -x.

SOUTHERN DISTRICT OF NEW YORK, ss.:

         BLAIRE TOLEMAN, being duly sworn, deposes and says
that she is a Special Agent with the Federal Bureau of
Investigation ("FBI") and charges as follows:

                            COUNT ONE

            (Conspiracy to Commit Honest Services Wire Fraud)
```